UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHADWICK WILLACY,

      Petitioner,

v.                                    CASE NO. 6:08-cv-619-Orl-31KRS

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.

_____/

## ORDER

In 1991, Chadwick Willacy was convicted and sentenced to death for the brutal murder of Marlys Sather.  Following several appeals, collateral proceedings and a re-sentencing in 1995, Willacy is now before this Court seeking a writ of habeas corpus. Having reviewed the Amended Petition for Habeas Corpus Relief (Doc. No. 69) and supporting memorandum of law (Doc. No. 70), the Response (Doc. No. 75) to the Petition, and Petitioner's Reply (Doc. No. 80), the Court finds the Petition to be without merit.

## I.    STATEMENT OF THE FACTS

The facts adduced at trial, as set forth by the Supreme Court of Florida, are as follows:

> On September 5, 1990, Marlys Sather returned home unexpectedly to find Willacy, her next-door neighbor, burglarizing her house. Willacy bludgeoned Sather and bound her ankles with wire and duct tape. He

choked and strangled her with a cord with a force so intense that a portion of her skull was dislodged. Willacy then obtained Sather's ATM pin number, her ATM card, and the keys to her car; drove to her bank; and withdrew money out of her account.  Willacy hid Sather's car around the block while he made trips to and from the house.  He placed stolen items on Sather's porch for later retrieval, took a significant amount of property from Sather's house to his house, and then drove the car to Lynbrook Plaza where he left it and jogged back to Sather's home.  Upon his return, Willacy disabled the smoke detectors, doused Sather with gasoline he had taken from the garage, placed a fan from the guest room at her feet to provide more oxygen for the fire, and struck several matches as he set her on fire.

When Sather failed to return to work after lunch, her employer notified the Sather family of her absence.  Sather's son-in-law went to her home and found a shotgun and several electronic items lying on the back porch. Inside the home, he found Sather's body. Medical testimony established that her death was caused by inhalation of smoke from her burning body.

Law enforcement officers conducted an investigation into Sather's murder, uncovering a large amount of evidence linking Willacy to the murder.  Willacy's fingerprints were found on the fan at Sather's feet, the gas can, and a tape rewinder at Sather's house.  Witnesses reported seeing a man matching Willacy's description near Sather's house and driving Sather's car on the day of the murder.  Further, Willacy's girlfriend, Marisa Walcott, telephoned law enforcement officers after discovering a woman's check register in Willacy's wastebasket.  Law enforcement officers recognized the check register as belonging to Sather and subsequently arrested Willacy. While executing a search warrant on Willacy's home, law enforcement agents uncovered some of Sather's property, as well as several articles of clothing containing blood consistent with Sather's blood type.

*Willacy v. State,*  967 So. 2d 131, 135 (Fla. 2007).

## II.    Procedural History

Petitioner was charged by indictment with first degree murder from a premeditated

design, burglary, robbery, and arson.  *See* Ex. A-20 at 3251.[1]  Judge Theron Yawn presided

over the trial.  On October 17, 1991, the jury convicted Petitioner on all four counts.  *See* Ex.

A-21 at 3355-58.  Following the penalty phase, the jury recommended death by a vote of

nine to three.  *Id*. at 3411.  Judge Yawn sentenced Petitioner to death as to the murder

count[2] and to imprisonment for a term of thirty years as to each of the remaining counts,

with the sentences to run consecutively.  *Id*. at 3461-76.

On direct appeal, Petitioner raised eight claims.[3]  *See* Ex. B.  The Supreme Court of

Florida affirmed the convictions but vacated the death sentence and remanded the case for

a new sentencing proceeding based on Petitioner's claim that the trial court did not give

defense counsel an opportunity to rehabilitate a juror who said she was opposed to the

death penalty.  *Willacy v. State*, 640 So. 2d 1079 (Fla. 1994).

───────────────

[1]References to the record will be made by citing to the particular volume and page of the advanced appendix.  For example, "Ex. A-1 at 1" refers to page one of the volume labeled Exhibit A-1.

[2]Judge Yawn found four aggravating circumstances: the murder was committed 1) while engaged in the commission of arson; 2) for pecuniary gain; 3) in an especially heinous, atrocious, and cruel manner; and 4) to avoid arrest.  *Id*. at 3463-65.  The sole mitigating circumstance found was that Petitioner had no significant history of prior criminal activity.  *Id*. at 3465.  Two non-statutory mitigating circumstances were found: 1) Petitioner had no history of violence nor had he shown a tendency toward violence; and 2) Petitioner had performed well in confinement prior to trial and had participated in self-improvement groups and classes while in jail.  *Id*. at 3466-67.

[3]During the pendency of the direct appeal, Petitioner moved for temporary relinquishment of jurisdiction in order for the trial court to hold an evidentiary hearing on his motion for a new trial in which he claimed that juror Edward Paul Clark, the jury foreperson of his trial in 1991, was under prosecution for grand theft.  *See* Ex. A-22 at 3633-37.  Judge Yawn held an evidentiary hearing on the matter and, following the hearing, entered an order denying the motion for a new trial.  *Id*. at 3674-79.

At re-sentencing, Petitioner was represented by new counsel, and Judge Yawn again presided.  The jury subsequently entered an Advisory Verdict, recommending by a vote of eleven to one that Petitioner be sentenced to death.  *See* Ex. G-3 at 491.  Judge Yawn followed the jury's recommendation and sentenced Petitioner to death.[4]  *See* Ex. G-4 at 614-24.

On direct appeal after re-sentencing, Petitioner raised eleven claims.  *See* Ex. H.  The Supreme Court of Florida denied each of the claims and affirmed Petitioner's death sentence.  *Willacy v. State*, 696 So. 2d 693 (Fla. 1997).   Petitioner filed a petition for writ of certiorari with the United States Supreme Court, which was denied.  *See Willacy v. Florida*, 522 U.S. 970 (1997).  *See* Ex. L-3.

On May 11, 1998, Petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 with a special request for leave to amend.  On March 18, 2002, he filed an amended motion for postconviction relief in which he raised thirty-one claims.  The trial court summarily denied seventeen claims on September 24, 2003, and granted an evidentiary hearing as to the remaining claims.  *See* Ex. M-17 at 2294-2313.  An evidentiary hearing was held, and the trial court entered an order on November 19, 2004, denying the remaining claims.  *See* Ex. M-19 at 2545-2586.

---

[4]Judge Yawn found five aggravating factors: the murder was 1) committed in the course of a felony; 2) committed to avoid lawful arrest; 3) committed for pecuniary gain; 4)  especially heinous, atrocious, and cruel; and 5) committed in a cold, calculated, and premeditated manner.  *See* Ex. G-4 at 614-18.  No statutory mitigating factors were found.  The non-statutory mitigating factors presented to the trial court were carefully considered and either rejected outright or assigned little weight.  *Id*. at 623.

Petitioner appealed the denial, raising seven claims, and also submitted a petition for writ of habeas corpus. *See* Ex. N. The Supreme Court of Florida affirmed the denial of the motion for postconviction relief and denied the petition for a writ of habeas corpus. *Willacy v. State*, 967 So. 2d 131 (Fla. 2007). Petitioner filed a petition for writ of certiorari with the Supreme Court of the United States, which was denied. *See Willacy v. Florida*, 552 U.S. 1265 (2008); Ex. U-3.

On September 29, 2009, Petitioner filed another petition for writ of habeas corpus with the Supreme Court of Florida, which was denied on March 19, 2010. *See* Ex. U-3 and Ex. Y.

On November 10, 2010, Petitioner filed a second motion for postconviction relief. *See* Ex. AA-2. The trial court entered an order on December 13, 2010, denying the motion as successive. *See* Ex. AA-5. The Supreme Court of Florida affirmed *per curiam* on April 26, 2012. *See Willacy v. State*, 90 So. 3d 822 (Fla. 2012); Ex. AA-9. The Supreme Court of the United States denied Petitioner's petition for writ of certiorari. *See Willacy v. State*, 133 S. Ct. 998 (2013); Ex. AA-12. This case was initiated on April 22, 2008, but was stayed on May 13, 2011 (Doc. No. 45) so Petitioner could exhaust a claim in the state courts.

## III.   GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of

state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

**A.      Standard of Review Under the AEDPA**

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).  The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts.  Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**B.    Standard for Ineffective Assistance of Counsel**

The Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[5]  *Id*. at

---

[5]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

687-88.  A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id.* at 689-90.  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.  Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight.  *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy.  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).  Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

Additionally, it is well established that a defendant has the right to effective counsel on appeal.  *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984).  The Eleventh Circuit Court of Appeals has applied the Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims.  *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987).

8

Thus, in order to establish ineffective assistance of appellate counsel, Petitioner must show (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

## C.   Exhaustion and Procedural Default

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A)   the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)   (i)   there is an absence of available State corrective process; or
>
> (ii)   circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  In addition, a federal habeas court is precluded from considering

claims that are not exhausted but would clearly be barred if returned to state court. *Id.* at

735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which

the petitioner would be required to present his claims in order to meet the exhaustion

requirement would now find the claims procedurally barred, there is a procedural default

for federal habeas purposes regardless of the decision of the last state court to which the

petitioner actually presented his claims).

In order to satisfy the exhaustion requirement, a state petitioner must "fairly

presen[t] federal claims to the state courts in order to give the State the opportunity to pass

upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513

U.S. 364, 365 (1995) (citing *Picard*, 404 U.S. at 275-76) (internal quotation marks omitted).

The petitioner must apprise the state court of the federal constitutional issue, not just the

underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d

732 (11th Cir. 1998). The Supreme Court has observed that "Congress surely meant that

exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).

Furthermore, the Court explained:

> [c]omity concerns dictate that the requirement of exhaustion is not satisfied
> by the mere statement of a federal claim in state court. Just as the State must
> afford the petitioner a full and fair hearing on his federal claim, so must the
> petitioner afford the State a full and fair opportunity to address and resolve
> the claims on the merits.

*Id.*

Procedural default will be excused only in two narrow circumstances. First, a

petitioner may obtain federal review of a procedurally defaulted claim if he can show both

10

"cause" for the default and actual "prejudice" resulting from the default.  "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).  To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different.  *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, in which a "constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).  To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  In addition, "'[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324).

## IV.     MERITS OF THE PETITION

### A.     Claim One

Petitioner claims that the trial court erred by failing to grant a new trial when it was discovered that jury foreman Edward Clark was under prosecution when selected as juror and, therefore, ineligible to serve on the jury under section 40.013(1), Florida Statutes

(1991).[6]  The trial court held an evidentiary hearing on the issue when it was deciding Petitioner's motion for a new trial.  Judge Yawn found that Petitioner's counsel had been put on notice of Clark's status as a pretrial intervention ("PTI") candidate prior to the verdict, that Petitioner's counsel took no action on the matter, and that Clark was not disqualified under section 40.013(1) because he was not under a pending criminal prosecution when he served as a juror.  *See* Ex. A-22 at 3676-78.  The Supreme Court of Florida found that Clark's placement in the Pretrial Intervention Program did not equate with prosecution, and, because he was not under prosecution, Petitioner's motion for a new trial was properly denied.  *Willacy*, 640 So. 2d at 1083.  The Supreme Court of Florida also found that, during the trial, the State informed Petitioner's counsel of Clark's status and that, by failing to make a timely objection, Petitioner waived this claim.  *Id.*

1.     *Mr. Clarks' Selection on the Jury*

As noted above, the trial court held an evidentiary hearing on the motion for a new trial.  Petitioner was represented by Kurt Erlenbach and Susan Erlenbach at both the guilt and penalty phases of the trial.  *See* Ex. A-22 at 3557, 3611.[7]  Erlenbach represented Petitioner on direct appeal.  During preparations relating to the appeal, he discovered that Clark had "criminal proceedings pending against him" at the time of his participation as

---

[6]"No person who is under prosecution for any crime . . . shall be qualified to serve as a juror."  §40.013(1), Fla. Stat. 1991.

[7]Hereinafter Kurt Erlenbach will be referred to as "Erlenbach," and Susan Erlenbach will be referred to as "Ms. Erlenbach."

a juror.  *Id*. at 3558.[8]

Clark was arrested on February 19, 1991, and charged with grand theft.  *Id*. at 3653.

He posted a $1,000 bond on the same day.  *Id*. at 3634.  Clark's attorney submitted the case

for PTI review, and, on October 2, 1991, assistant state attorney Christopher White, a

prosecutor in Petitioner's case, approved the PTI program's recommendation that Clark

be accepted.  *Id*. at 3564-67, 3591-92.  Joseph F. Brand, who worked for the Department of

Corrections, Probation and Parole Services, had recommended that the case be accepted

for PTI after investigating the case and interviewing Petitioner.  *Id*. at 3563.  Brand sent a

letter to Clark on October 7, 1991, telling him that the PTI program contract[9] signing date

would be held on October 18, 1991.  *Id*. at 3563.  Clark subsequently telephoned Brand and

told him that he needed to reschedule the signing date because he had been selected to sit

on a jury.  *Id*. at 3568.  Brand informed White's secretary of Clark's situation, and the

secretary informed White.  *Id*. at 3569, 3586-87, 3592-93.

After the jury had been selected in Petitioner's case, White testified that he

approached Petitioner's defense table and informed Petitioner's attorneys that "there was

a juror that [he] believed might be in the PTI Program."  *Id*. at 3593-96.[10]  Craig Rappel, one

---

[8]The guilt phase proceedings occurred from October 7, 1991, through October 17, 1991.

[9]Under the contract between the defendant and the State Attorney's Office, the defendant agreed to abide by all the rules and conditions of Pretrial Intervention.  *Id*. at 3570.

[10]White was not sure whether he told one of Petitioner's attorneys or both of them. *Id*. at 3593.  Petitioner's attorneys denied that they were told of any issues involving Clark

of the assistant state attorneys in Petitioner's case, testified that, during the early stages of the trial but after jury selection, White informed him that Clark was involved in the PTI program. *Id*. at 3607. Rappel also stated that White had discussions first with Ms. Erlenbach and then with Erlenbach about Clark being in the PTI program. *Id*. at 3607-10.

The PTI program contract was signed on October 29, 1991, *id*. at 3597, and Clark completed the program. On May 14, 1992, White entered a *nolle prosequi* as to the case. *Id*. at 3572, 3634.

On October 7, 1991, during jury qualification proceedings and prior to jury selection, the jury clerk asked the venire a series of questions under oath pertaining to their qualifications to sit as jurors. *Id*. at 3535-39. One of the questions concerned whether any prospective jurors were under prosecution for any crime at the time of their service. *Id*. at 3537-39. Clark did not respond or otherwise reveal the fact of his arrest or the status of his criminal case. *Id*. at 3539.

During voir dire of the jury, Clark responded to questions from the prosecution and defense counsel and revealed biographical information. *See* Ex. A-1 at 84, Ex A-4, 616-18. Clark and another prospective juror were asked by the prosecutor:

> Have either of you had any sort of contact with a law enforcement agency or officer that left you with a particularly strong feeling about that contact in the way that you were treated or the way your matter was handled?

*Id.* at 621-22. The other prospective juror answered "[n]ever," and there is no indication that Clark answered the question. *Id*. at 622. They were also asked by the prosecutor:

during the trial. *Id*. at 3557-60, 3612.

"Have either of you had any prior experience in the courtroom before in any capacity at all?"  *Id*. at 621.  Again, the other prospective juror answered "[n]ever," and there is no indication that Clark answered the question.  *Id*.

   2.    *Discussion of Claim One*

As noted above, this claim was raised on direct appeal; however, Petitioner did not present the claim in terms of a deprivation of a federal constitutional right.  Generally, a "federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies."  *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).  The exhaustion of state remedies requires that petitioners "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citation omitted) (quotations omitted). Hence, "[i]f state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  *Id*. at 365-66; *see also Snowden*, 135 F.3d at 735 (holding that "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.").

In the present case, Petitioner only apprised the state court that the instant claim involved a violation of state law.  Petitioner, on direct appeal, made no reference to any of the federal constitutional issues raised here.  *Ziegler v. Crosby*, 345 F.3d 1300, 1307 (11th Cir. 2003) (finding that the petitioner's federal habeas claims were not raised in the state court

when the direct appeal made no reference to the federal constitutional issues raised in the federal habeas petition). Petitioner did not alert the state court to the fact that he was asserting claims under the United States Constitution. "[O]nly claims that were raised as federal constitutional issues before the state courts have been exhausted in the state courts." *Snowden*, 135 F.3d at 736 n.4. Thus, Petitioner's claim is unexhausted.[11]

Moreover, because he would be precluded from now raising this claim in the state courts, it is procedurally defaulted. Petitioner has not shown either cause or prejudice that would excuse the default. Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception. The entire record has been reviewed, and the Court concludes that Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, this claim must be denied.[12]

Alternatively, this claim must fail on the merits. As determined by the Supreme Court of Florida in addressing this claim, pretrial intervention is "merely an alternative to prosecution." *Cleveland v. State*, 417 So. 2d 653, 654 (Fla. 1982). The PTI program "is a grant

---

[11]The Court also notes that Petitioner has not actually presented a federal constitutional issue in the present habeas petition, as his claim appears to involve state law issues only. Since claim one appears to actually be a state law claim, it is not subject to federal habeas review and must be denied. *See White v. Singletary*, 70 F.3d 1198 (11th Cir. 1995) (finding that claims alleging that the state court erred in its denial of a request for the grand jury transcript, in camera review of transcripts, and the names of grand jurors and in its refusal to review exculpatory evidence raised issues of state law and, therefore, did not present a question for federal habeas review).

[12]The Supreme Court of Florida also found that Petitioner's counsel failed to make a timely objection to Clark's status and that, therefore, the claim was waived. Consequently, this claim is procedurally barred on that basis as well.

16

of prosecutorial grace as it serves as an *alternative* to criminal prosecution." *State v. Simons*, 22 So. 2d 734, 737 (Fla. 1st DCA 2009) (Hawkes, J., dissenting) (emphasis added).  Because Clark was not under prosecution at the time of his selection on the jury, there was no violation of section 40.013(1), and the trial court did not err when it failed to grant a new trial.

Further, since counsel was made aware of Clark's status and failed to make a timely objection, Petitioner waived this claim for appellate review.  *See Carratelli v. State,*  832 So. 2d 850, 856 (Fla. 4th DCA 2002) ("a party must obtain a ruling from the trial court in order to preserve an issue for review.").  As such, it cannot be said that the state court's denial of this claim was "contrary to, or involved an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d).  Consequently, Petitioner is not entitled to federal habeas relief on this claim.

**B.    Claim Two**

Petitioner argues that trial counsel was ineffective for failing to inquire during voir dire as to Clark's status.  Petitioner notes that Clark failed to respond when asked if he was under prosecution for any crime and if he had prior experience in the courtroom. According to Petitioner, counsel should have pursued a response from Clark.

This claim was raised in Petitioner's motion for postconviction relief, and the trial court found that Petitioner was improperly attempting to couch an issue on direct appeal into an ineffective assistance of counsel claim and that, alternatively, Petitioner had failed

to show any prejudice because the Supreme Court of Florida previously found that Clark was not under prosecution. *See* Ex. M-19 at 2560-61. The Supreme Court of Florida held that, because it had determined on direct appeal that Clark was not under prosecution during Petitioner's trial, this claim was without merit. *Willacy*, 967 So. 2d at 140 n.9.

As discussed above, Clark was not under prosecution at the time of his selection on the jury, and there was no violation of section 40.013(1). Consequently, Petitioner's counsel was not ineffective for failing to inquire during voir dire as to Clark's status. Likewise, there has been no showing of prejudice with regard to this issue. Under the circumstances, Petitioner has not shown that the state court's denial of this claim was "contrary to, or involved an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to federal habeas relief on this claim.

## C.   Claim Three

Petitioner argues that counsel was ineffective for failing to object and/or in allowing an ineligible juror to be seated on the jury. According to Petitioner, if, in fact, the State had informed his counsel of Clark's status, then counsel acted unreasonably by failing to move to exclude Clark from the panel. This claim was raised in Petitioner's motion for postconviction relief, and the trial court found that Petitioner had not demonstrated prejudice since the Supreme Court of Florida examined the issue of Clark's eligibility to serve as a juror and specifically determined that Clark was not under prosecution. *See* Ex. M-17 at 2302. The Supreme Court of Florida noted that it had previously found that Clark

18

was eligible to serve on the jury and that, therefore, even if counsel had sought to have Clark disqualified, such an objection ultimately would have failed. *Willacy*, 967 So. 2d at 140.

In light of the Supreme Court of Florida's determination that Clark was not under prosecution and that he was eligible to serve on the jury, Petitioner has not shown prejudice resulted from counsel's inaction. As such, Petitioner has not shown that the state court's denial of this claim was "contrary to, or involved an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d).[13]

## D.    Claim Four

Petitioner asserts that he received ineffective assistance of appellate counsel because appellate counsel failed to raise the following issues on direct appeal:  a) the trial court failed to rule on Petitioner's objections to the trial court's order denying the motion for new trial; b) the inherent prejudice to Petitioner as a result of the trial court's use of an incorrect standard in denying the motion for a new trial; and c) the State's prosecutorial misconduct in failing to inform the trial court of Clark's status.

It does not appear that any of these issues were raised with the state courts.[14]

---

[13]The Court notes that, at the evidentiary hearing on the motion for a new trial, Petitioner's counsel denied that they were informed about Clark's status by the State. *See* Ex. A-22 at 3557, 3614-15.  Consistent with this testimony, Petitioner has failed to demonstrate that counsel acted unreasonably with regard to this matter.

[14]Although Petitioner raised ineffective assistance of appellate counsel claims in his first state habeas petition, he did not raise the issues presented here.

Petitioner has not shown either cause or prejudice that would excuse the procedural default. Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception. The entire record has been reviewed, and the Court concludes that Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, this claim is procedurally barred.

Additionally, the record reflects that Petitioner's appellate counsel submitted an initial brief which was comprehensive, thorough, and well-argued. Certainly, the record clearly evinces the thoroughness and reasonableness of appellate counsel's work. *Cf. Thomas v. Scully*, 854 F. Supp. 944 (E.D.N.Y. 1994) (the appellate brief submitted by counsel clearly showed the thoroughness of counsel's work). As discussed by the district court in *Richburg v. Hood*, 794 F. Supp. 75 (E.D.N.Y. 1992),

> [T]he court simply notes that the decision of appellate counsel to choose among plausible options of appellate issues is preeminently a strategic choice and is "virtually unchallengeable." The petitioner has not even undertaken to demonstrate that the decision of his attorney not to raise this issue constituted an "unprofessional error" or that such error prejudiced his appeal.

*Id.* at 78. In this case, the Court finds that appellate counsel's decision not to pursue these issues was consistent with reasonable appellate strategy that, under the deferential standard of review articulated in *Strickland*, should not be second-guessed. *See Gray v. White*, No. C-94-2434 EFL, 1997 WL 16311, at *9 (N.D. Cal. January 6, 1997) ("appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. The weeding out of weaker issues is widely recognized as one of the hallmarks

of effective appellate advocacy.")(citations omitted); *Carlos v. Cruz*, No. CV 96-5209 (RED), 1997 WL 269591, at *4 (E.D.N.Y. April 21, 1997) ("On appeal, counsel is not required to argue every non-frivolous issue; rather, the better strategy may be to focus on a few more promising issues so as not to dilute the stronger arguments with a multitude of claims"; moreover, the Court must not second-guess the reasonable decisions of appellate counsel to press certain issues instead of others, and the lack of success on appeal is not a basis to impugn appellate counsel's reasonable choices or performance).   Thus, the Court finds that appellate counsel's performance was not deficient and that Petitioner has not demonstrated prejudice.  Hence, this claim must fail on the merits.

**E.**     **Claim Five**

Petitioner argues that the State denied him his right to a fair trial by failing to inform the trial court of Clark's ineligibility to serve as a juror.   This claim was raised in Petitioner's motion for postconviction relief, and the state trial court found as follows:  the claim was based on the factual premise that Clark was under prosecution; that the Supreme Court of Florida upheld the trial court's finding that Clark was not under prosecution; and that the claim was barred because it was raised on direct appeal and decided adversely to Petitioner.  *See* Ex. M-17 at 2298.  It does not appear that Petitioner raised this claim in his appeal of the denial of his motion for postconviction relief.

This claim is procedurally barred because the trial court so determined in its order denying Petitioner's motion for postconviction relief and because Petitioner failed to appeal the denial of the claim.  *See Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)

(exhaustion requires not only the filing of a Rule 3.850 motion, but also an appeal of its denial).

Petitioner has not shown either cause or prejudice that would excuse the procedural default. Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception. Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, this claim is procedurally barred.

Alternatively, this claim is denied on the merits. Because Clark was not under prosecution at the time of his service on the jury, there was no impropriety on the part of the prosecution.

## F.    Claim Six

Petitioner contends that the trial court erred in allowing the State to exercise a peremptory challenge to remove Alvin Payne from the jury panel. According to Petitioner, the State used a peremptory challenge "to exclude the only black individual on the jury panel," and "the strike of Payne was tainted by racial bias . . . ." *See* Doc. No. 70 at 21, 26. This claim was raised on direct appeal, and the Supreme Court of Florida found that the trial court conducted a proper *Neil*[15] inquiry and that the State put forth legitimate non-racial reasons for its peremptory challenge.

Although this claim was raised on direct appeal, it was not raised in terms of a federal constitutional violation. As discussed previously, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies.

---

[15]*State v. Neil*, 457 So. 2d 481 (Fla. 1984).

In the present case, Petitioner only apprised the state court that the instant claim involved a violation of state law, and, on direct appeal, he made no reference to the federal constitutional issues raised here.

Moreover, since he would be precluded from now raising this claim in the state courts, it is procedurally defaulted.  Petitioner has not shown either cause or prejudice that would excuse the default.   Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception.  Petitioner is unable to satisfy either of the exceptions to the procedural default bar.  Therefore, this claim must be denied.

Alternatively, this claim is without merit.  The State peremptorily challenged Payne, and Petitioner objected on the grounds that the challenge was racially motivated.  *See* Ex. A-3 at 442.  The trial court held a *Neil* inquiry[16] and found that Petitioner's objection was groundless.  In particular, the State set forth several reasons for challenging Payne:  his prior involvement with the criminal judicial system based on his plea of *nolo contendere* to disorderly conduct and resisting arrest without violence; misrepresentation about prior employment; misrepresentation of past criminal charges; and he had testified on behalf of a defendant in a drug trial.  *Id*. at 444-45.  The record reflects that the trial court conducted a proper *Neil* inquiry and that the State set forth legitimate non-racially motivated reasons for its peremptory challenge of Payne.  As such, Petitioner fails to meet his burden of

---

[16]Under *Neil*, "a party's peremptories cannot be examined until the issue is properly presented to the trial court and until the trial court has determined that such examination is warranted. If such occurs, the challenged party must show that the questioned challenges, but no others, were not exercised solely on the basis of race." *Neil*, 457 So.2d at 488.

proving that the state courts unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in denying relief on this claim.

## G.    Claim Seven

Petitioner asserts that counsel was ineffective at his 1995 penalty phase proceeding because counsel failed to investigate and present evidence of certain statutory and non-statutory mitigating factors. *See* Doc. No. 69 at 36.   Specifically, Petitioner alleges that counsel should have investigated Petitioner's mental health background and presented evidence that Petitioner suffered from attention deficit hyperactivity disorder ("ADHD") and anti-social personality disorder; that Petitioner had a history of drug abuse; and that Petitioner was physically abused by his father and witnessed domestic violence by his father against his mother on an on-going basis during his childhood and adolescence. *Id.* at 41-43; Doc. No. 70 at 29-34.   Petitioner contends that this evidence would have suggested to the jury that Petitioner was under extreme mental or emotional disturbance at the time of the crime.   *See* Doc. No. 70 at 34.   Petitioner also contends that the state court's determination that counsel was not ineffective for his failure to further investigate Petitioner's family and mental health background was objectively unreasonable. *See* Doc. No. 70 at 28-29.

Petitioner raised this claim in his motion for postconviction relief.  The trial court held an evidentiary hearing and rejected the claim in a detailed order. *See* Ex. M-19 at 2569.

### 1.    *Evidentiary Hearing*

In December 2003 and February 2004, the state trial court conducted an evidentiary

24

hearing in response to Petitioner's motion for postconviction relief.  Sixteen witnesses testified at the hearing including James Kontos, Petitioner's counsel at resentencing; mental health experts for both Petitioner and the State; and Petitioner's family members.

At the hearing, Kontos testified that eleven days prior to the start of the 1995 penalty phase, on the advice of another attorney, he asked Dr. William E. Riebsame, a licensed psychologist to evaluate Petitioner.  *See* Ex. M-7 at 1004.  Kontos testified that his intent in having Dr. Riebsame evaluate Petitioner was to have him look at the statutory mitigator of extreme emotional or mental disturbance.  *Id*. at 1013.  Kontos admitted that he did not provide Dr. Riebsame with enough background information to determine whether the crime had been committed while Petitioner was under the influence of extreme emotional or mental disturbance and that with the benefit of hindsight, he would have given more background information to Dr. Riebsame.  However, at the time, he assumed that the doctor would tell him the types of information he needed.  *Id*. at 1010, 1012.

Kontos testified that  Dr. Riebsame told him that testing indicated Petitioner could have been  a sociopath or psychopath.  *Id*. at 1026.  Kontos determined that a jury would not react favorably to this diagnosis and that the doctor "definitely couldn't help in the case." *Id*. at 1027.  Furthermore, Kontos testified that he had difficulty applying a mental health mitigator to the case because Petitioner had not admitted to involvement in the crime, and Dr. Riebsame indicated that such an admission was necessary.  *Id*. at 1081.

Kontos further testified that he had a cohesive plan or theory as to how he wanted to present Petitioner in the eyes of the jury and that he formulated a plan after conferring

with Petitioner and his family.  *Id*. at 1069.  Kontos hoped to present Petitioner as a "life worth saving"and that presenting evidence of Petitioner's drug habit would not have necessarily meshed with that theory.  *Id*. at 1070-71.  He further noted that a diagnosis of psychopath or sociopath would be difficult to reconcile with his life-worth-saving defense.  *Id*. at 1080-81.  Kontos also wanted to foster the idea that the State's case was not powerful and that Petitioner may have been only a minor participant in the crime.  *Id*. at 1083.

Dr. Riebsame testified at the evidentiary hearing as Petitioner's mental health expert.[17]  Dr. Riebsame determined that Petitioner met the diagnoses for cocaine abuse, cannabis abuse, alcohol abuse, ADHD and antisocial personality disorder.  *See* Ex. M-8 at 1171-72.  Dr. Riebsame also determined that Petitioner likely met the criteria for a diagnoses of cocaine intoxication and cocaine withdrawal at the time of the offense and soon thereafter.  *Id*. at 1172.  Dr. Riebsame agreed that, had he done the same testing on Petitioner when initially retained by Kontos in 1995, his diagnosis of anti-social personality disorder would have been the same.  *Id*. at 1256.

Dr. Riebsame determined that Petitioner's capacity to appreciate the criminality of his conduct was not impaired and that Petitioner's capacity to conform his conduct to the requirements of the law was impaired, but not substantially.  *Id*. at 1185.  Dr. Riebsame testified that, because of Petitioner's crack cocaine binge combined with ADHD, the crime was committed while Petitioner was under the influence of extreme mental or emotional

---

[17]In 2000, Dr. Riebsame was retained by collateral counsel to evaluate Petitioner and form opinions regarding psychological mitigation.  *See* Ex. M-8 at 542.

disturbance, a statutory mitigator under Florida law. *Id*. at 1188-90. Dr. Riebsame testified that, because Petitioner did not admit committing the murder, he received no information from Petitioner regarding his mental state at the time of the crime. *Id*. at 1207.

Dr. Jeffrey A. Danziger, the State's mental heath expert testified that he was retained by the State to review the record, conduct an examination of Petitioner, and to offer opinions as to whether mitigating factors existed. *See* Ex. M-11 at 1490. Dr. Danziger diagnosed Petitioner with cannabis abuse, cocaine abuse, alcohol abuse, antisocial personality disorder and a possible history of ADHD.[18] *Id*. at 1495.

Dr. Danziger was of the opinion that, at the time of the crime, Petitioner had the ability to appreciate the criminality of his conduct and had the ability to conform his conduct to the requirements of the law. *Id*. at 1518-19. Dr. Danziger did not believe Petitioner was under extreme mental or emotional disturbance at the time of the crime except for a possibility of intoxication. *Id*. at 1517-18. Dr. Danziger testified that, because he denied committing the murder, Petitioner had not provided him with relevant input as to his mental thoughts at the time of the murder. *Id*. at 1496.

On cross-examination, Dr. Danziger agreed that child abuse was a potential mitigator and that the risk of developing a conduct disorder increases in the presence of abuse and that children who grow up in violent households are at greater risk of committing violent acts. *Id.* at 1527-28, 1562. However, Dr. Danziger found no mitigating

---

[18]Dr. Danziger testified that, in his opinion, there was not enough evidence to show that Petitioner met the criteria for ADHD. *See* Ex. M-11 at 1133.

factors other than abuse.  *Id.* at 1565.

The trial court heard testimony from Petitioner's sister, mother and father. The family members testified that Petitioner's father, Colin Willacy ("Colin"), drank to the point of intoxication several times per week.  *See* Ex. M-9 at 1323-24; Ex. M-10 at 1371, 1417. When intoxicated, Colin "became irrational" and would beat Petitioner for minor infractions.  *See* Ex. M-9 at 1329-30; Ex. M-10 at 1378, 1420, 1424, 1447.  Colin testified that the beatings were 'brutal," *see* Ex. M-10 at 1447, and that he would use fists, belts, or anything else when he beat Petitioner.  *Id.* at 1429-30.  Each family member testified regarding a particular incident when Petitioner was a young child in which Colin beat Petitioner with the leg of a chair.  *See* Ex. M-9 at 1328-31; Ex. M-10 at 1380, 1422-23.  All three family members testified that Kontos had not asked about physical abuse, but if he had, they stated that they would have told him about it.  *See* Ex. M-9 at 1334; Ex. M-10 at 1384, 1425-26.

Heather Willacy, Petitioner's sister, testified that Petitioner began using drugs at about the age of sixteen or seventeen.  *See* Ex. M-9 at 1335-36.  Audry Willacy, Petitioner's mother testified that Petitioner had never been a problem child until he began using drugs. *See* Ex. M-10 at 1406.  She testified that, when Petitioner was about 20, she "turned him out" of her house briefly in response to Petitioner's drug use and that he was living on the roof of a building during that time.  *Id.* at 1386-87.  He was gone for about four weeks.  *Id.* at 1392.

Both Heather and Audry Willacy admitted that they had formerly denied that

28

Petitioner had ever gotten into trouble at school or had prior mental health counseling. *See* Ex. M-9 at 1345-46; Ex. M-10 at 1450. Audry testified that, when initially asked about problems with Petitioner during his childhood, she denied that any existed because she did not remember them. *See* Ex. M-10 at 1402. Colin testified that he had denied Petitioner's prior involvement with mental health professionals because he did not see why he should divulge personal family matters to Petitioner's attorney. *Id*. at 1434.

Finally, Heather testified that Petitioner had a very good relationship with both parents and that she considered her household to be a very happy one. *See* Ex. M-9 at 1343-44. Audry testified that she brought her son up well in a loving religious home. *See* Ex. M-10 at 1405.

2.    *Analysis*

Petitioner argues that the state court's determination that counsel's performance was not deficient is "objectively unreasonable and [the state court's] factual findings are rebutted by clear and convincing evidence." *See* Doc. No. 70 at 29. In addition, Petitioner argues that "[c]ontrary to clearly established federal law, the state court conducted an unreasonable prejudice analysis." *Id*. at 39. Petitioner relies on *Porter v. McCollum*, 558 U.S. 30 (2009) to support his contention that counsel was ineffective.

Under *Strickland*, Petitioner's counsel was required to make a reasonable investigation into "possible mitigating factors and ma[k]e a reasonable effort to present mitigating evidence to the sentencing court." *Anderson v. Sec'y, Florida Dep't of Corr.*, 752 F.3d 881, 89(11th Cir. 2014) (quotation omitted) (citations omitted); *see also Porter v.*

*McCollum*, 558 U.S. 30, 39 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).   Counsel is deficient when he or she "'totally fails to inquire into the defendant's past or present behavior or life history' in a capital case . . . ." *Lynd v. Terry*, 470 F.3d 1308, 1317 (11th Cir. 2006) (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)).   However, "choices to forego further investigation into an issue are not deficient when a reasonable professional judgment based on a sufficient initial inquiry supports the decision to terminate the investigation." *Lynd*, 470 F. 3d at 1316-17 (citing *Strickland*, 466 U.S. at 690-91). Finally, this Court will not focus on whether counsel should have presented a mitigation case, but rather on whether the *investigation* supporting the decision not to further investigate was reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

a.    *Counsel's failure to adequately investigate childhood abuse*

The Eleventh Circuit Court of Appeals has been clear that the "Constitution imposes no burden on counsel to scour a defendant's background for potential abuse given the defendant's contrary representations or failure to mention the abuse." *Stewart v. Sec'y, D.O.C.*, 476 F.3d 1193, 1211 (11th Cir. 2007); *see also Anderson*, 752 F.3d 881.

Kontos testified that he interviewed Petitioner, his family members, and friends and received no indication that Petitioner had suffered abuse as a child or that he had been referred to a psychologist as a child.  *See* Ex. M-7 at 1015, 1082.  Kontos was unaware, and neither Petitioner nor his family informed him, that  Petitioner's father abused alcohol.  *Id*.

at 1082. Kontos stated in his closing argument that Petitioner's father had been a "strict disciplinarian." *Id*. However, especially given the repeated statements by family members and Petitioner regarding Petitioner's happy childhood home, the mere mention of strict disciplinarian is insufficient to establish deficiency of counsel for failing to follow up on the potential for child abuse. Moreover, there was no indication that Petitioner had a strained relationship with his father: In both the 1991 and 1995 penalty phases, Petitioner's family members testified under oath that the family was very loving.

Petitioner mentions *Wiggins v. Smith*, 539 U.S. 510 (2003) in support of this issue. However, *Wiggins* is distinguishable from the instant case.

In *Wiggins*, the petitioner was convicted of first-degree murder, robbery, and two counts of theft based upon the drowning of a woman and the ransacking of her apartment. *Wiggins,* 539 U.S. at 514-15. During the state postconviction proceedings, Petitioner sought to introduce mitigating evidence that his mother was a chronic alcoholic and was physically abusive to her children; that he and his siblings were frequently left home with no food and were forced to eat garbage and paint chips; that he was hospitalized after his mother intentionally burned his hand on the stove; that his mother had sex with men while her children slept in the same bed; that, at the age of six, he was placed in foster care where he was physically abused, molested and repeatedly raped; that he lived on the streets after running away from the foster care system; that he was gang-raped by a foster mother's sons; and, that, after entering a Job Corps program, he was sexually abused by his supervisor. *Id*. at 516-17. Additional evidence was presented relating to the petitioner's low IQ and

personality disorders.

The evidence of abuse in *Wiggins* was documented extensively in public records. *See Wiggins*, 539 U.S. at 523-25 (In addition to the presentence investigation reports, in which Wiggins described his youth as "disgusting," social services records revealed "[Wiggins'] mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food.").[19]  In the present case, there is no reference of abuse in any records.  As such, in light of Petitioner's and family member's assertions of no physical abuse, Kontos acted reasonably in not investigating the possibility that Petitioner suffered physical abuse as a child.  Therefore, the Florida court's determination that Kontos was not ineffective for failing to present mitigation evidence regarding the physical abuse Petitioner suffered as a child and adolescent was not contrary to, or an unreasonable application of, clearly established Federal law and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

b.      *Counsel's failure to conduct adequate mental health evaluation*

Petitioner also alleges that Kontos was ineffective for failing to conduct a thorough

---

[19]The *Wiggins* court also determined that the state court had based its decision in part on a clear factual error--that social service records available to counsel had noted instances of sexual abuse--even though the records contained no mention of any abuse. The Court determined that this reflected an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and highlighted the unreasonableness of the state court's decision.  *Id.* at 528.

mental health evaluation of Petitioner prior to the 1995 penalty phase trial.  Petitioner argues that Dr. Riebsame's 1995 cursory evaluation was an insufficient investigation into mental health mitigation.  *See* Doc. No. 70 at 31-32.

Kontos and Dr. Riebsame disagree as to the extent of the initial evaluation Dr. Riebsame was asked to conduct in 1995.  Dr. Riebsame testified that, when contacted by Kontos, he was asked to provide only an opinion regarding Petitioner's competency to proceed to trial.  *See* Ex. M-8 at 1114.  Kontos testified that the purpose of the evaluation was "to see if there was anything that Dr. Riebsame could do to provide me with evidence on mitigators."  *See* Ex. M-7 at 1005.  Kontos testified that, when he heard Dr. Riebsame's tentative diagnosis that Petitioner could be a sociopath or psychopath, he determined that a jury would not react favorably to those diagnoses and decided to close and lock the door on employing Dr. Riebsame as a mental health expert.  *Id.* at 1026-27.

Petitioner alleges that a complete evaluation would have uncovered evidence of Petitioner's abuse of drugs and alcohol, his ADHD, cocaine intoxication and cocaine withdrawal, and extreme emotional disturbance at the time of the crime.  *See* Doc. No. 69 at 42-43; Doc. No. 70 at 33-34.    Specifically, Petitioner asserts that the state court's determination that Kontos conducted a reasonable investigation into Petitioner's mental condition was objectively unreasonable and its factual findings are rebutted by clear and convincing evidence.  *See* Doc. No. 70 at 28-29.    Petitioner contends that counsel failed to conduct a reasonable investigation for possible mitigating evidence and such an evaluation would have led to valid mitigating evidence.  *Id.* at 30, 38.

Petitioner provides no evidence indicating that providing Dr. Riebsame with additional information or that conducting a more extensive mental health exam in 1995 would have changed counsel's strategic decision to present Petitioner as a life worth saving.

Kontos was questioned at the evidentiary hearing as to whether his trial strategy might have differed if he had been aware that Dr. Riebsame diagnosed Petitioner with ADHD after the re-sentencing trial. *See* Ex. M-7 at 1030. Kontos testified that, had he known of the diagnosis, he would have wanted to empanel jurors who had children with ADHD and he would have attempted to counter Dr. Danziger's diagnosis that Petitioner did not have ADHD. *Id*. at 1028. However, Kontos also testified that, at the time of the penalty phase, he was not familiar with ADHD, and that his opinions regarding ADHD were based upon his current (2003) knowledge regarding ADHD and not his knowledge of ADHD at the time of the 1995 penalty phase. *Id*. at 1028, 1087. As such, Kontos' statement at the evidentiary hearing regarding ADHD is irrelevant to the reasonableness of his actions in 1995. *See Wiggins*, 539 U.S. at 523 (noting that inquiry into reasonableness of counsel's performance "includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and that "[e]very effort [must] be made to eliminate the distorting effects of hindsight" (alterations in original) (quotation marks omitted)).

Furthermore, if counsel had presented evidence of Petitioner's ADHD, evidence of Petitioner's diagnosis of anti-social personality disorder would have also been introduced. Dr. Danziger testified that his diagnosis of anti-social personality disorder required the

34

existence of pre-existing behavior patterns. *See* Ex. M-11 at 1522. Therefore, in order to offer the diagnosis, Dr. Danziger would have mentioned Petitioner's torture of animals, including burying animals up to the neck and running them over with lawn mowers as a child. Dr. Danziger would have discussed the letters Petitioner sent to his teacher at the age of twelve in which he threatened to harm the teacher and her husband. *Id.* at 1522-23.

Kontos testified that he did not want the jury to hear evidence that Petitioner was a psychopath or sociopath because he felt the jury would not react favorably to such a diagnosis. *See* Ex. M-7 at 1027. It was not unreasonable for Kontos to make this determination. *See Parker v. Sec'y, Dep't of Corr.*, 331 F.3d 764, 788 (11th Cir. 2003)("Counsel decided not to put Dr. Stillman on the stand because Dr. Stillman had opined that Parker was antisocial and a sociopath, a diagnosis the jury might not consider mitigating . . . . Counsel cannot be deemed deficient in failing to call a witness whose testimony is of such limited value.").

Petitioner cites *Ake v. Oklahoma*, 470 U.S. 68 (1985) for the proposition that "counsel's limitation of a psychological evaluation to a competency determination, with no supporting materials, cannot possibly be deemed a competent investigation into mental health mitigation." *See* Doc. No. 70 at 31-32. *Ake* is easily distinguishable from the instant case.

*Ake* speaks to the State's responsibility to fund a mental health expert when a defendant's sanity is in issue and the defendant cannot afford to pay for the expert.[20] *Ake*

---

[20]The defendant in *Ake* behaved so strangely at arraignment that the trial judge, on his own motion, ordered a mental health evaluation to determine if defendant was competent to stand trial. *Id.* at 71. Defense counsel requested state funds to hire a

does not require that counsel, "faced with significantly less compelling evidence of mental instability . . . must move beyond a preliminary inquiry into an insanity defense and actually 'seek the assistance of a mental health expert.'" *Bertolotti v. Dugger*, 883 F.2d 1503, 1511 (11th Cir. 1989).   In the instant case, the State did not raise any issue regarding Petitioner's mental health.   Therefore, unlike the defendant in *Ake*, psychiatric assistance was not necessary to offer an opposing view of Petitioner's mental health.   In addition, Petitioner was not denied a mental health exam by the court.   Rather, Kontos made a reasonable decision to forego additional psychiatric testing because he believed that a jury would not be receptive to a depiction of Petitioner as a sociopathic or psychopathic.   The choice not to seek out such an evaluation is a tactical decision, which "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691.

Kontos had a plan to present Petitioner as a regular person whose life was worth saving and whose crime had been an aberration of behavior rather than a cold blooded murder.   *See* Ex. M-7 at 1021, 1080.   Kontos testified that a diagnosis of sociopath or

---

psychiatrist to determine whether Ake was insane at the time of the offense, but the trial judge refused to appropriate funds and Ake was found guilty.  At the penalty phase, the State relied significantly on the testimony of state psychiatrists to establish the likelihood of Ake's future dangerous behavior which was an aggravating factor in sentencing under Oklahoma law.  *Id.* at 73.  Ake had no expert witness to rebut this testimony or to introduce evidence in mitigation of his punishment.  *Id.*  The Supreme Court of the Untied States determined that, when the State has made the defendant's mental condition relevant to his criminal culpability and the punishment he might suffer, the defendant cannot offer a well-informed expert's opposing view  without a psychiatrist's assistance and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor.  *Id.* at 80-84.

psychopath would have been difficult to reconcile with this defense. *Id*. at 1080. Kontos also noted that Dr. Riebsame indicated that the mental health mitigator was problematic because Petitioner never admitted that he had committed the crime. *Id*. at 1081. Furthermore, nobody Kontos came into contact with indicated that Petitioner suffered from any sort of mental disorder, and he never saw any reason to look into Petitioner's school records or medical records. *Id*. at 484-85, 494. As such, the state court's determination that Kontos conducted a reasonable investigation into Petitioner's mental condition was not an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

      *c.*     *Drug Abuse*

Petitioner argues that "an individual's chemical dependency on drugs and alcohol constitutes valid mitigation." *See* Doc. No. 70 at 33. Petitioner was diagnosed with drug and alcohol abuse by both mental health experts. However, the experts disagreed as to whether Petitioner was intoxicated at the time of the murder. Dr. Riebsame determined that, because of Petitioner's cocaine binge, combined with ADHD, Petitioner was under the influence of extreme mental or emotional disturbance at the time of the murder. *See* Ex. M-8 at 1188-90. Dr. Danziger testified that he did not believe Petitioner was under extreme mental or emotional disturbance at the time of the crime and that Petitioner's statements and tapes were inconsistent with acute intoxication. *See* Ex. M-11 at 1498, 1500, 1518-19, 1555, 1557.

At the postconviction hearing, Dr. Riebsame stated that the crime was directly related

to Petitioner's crack cocaine binge the day of the crime and that Petitioner's cocaine use, paired with his ADHD, would have justified an argument for the statutory mitigator of extreme mental or emotional disturbance.[21] *See* Ex. M-8 at 1189-92. Dr. Riebsame noted that Petitioner did not admit drug use around the time of the murder, *id*. at 1197, 1241, and he based his opinion of intoxication on videos of Petitioner made soon after the murder and on investigative reports made available to him. *Id*. at 1270. Dr. Riebsame stated that, without the diagnosis of drug use, he would not have offered the opinion that Petitioner was under extreme mental or emotional disturbance at the time of the crime. *Id*. at 1269.

Dr. Danziger testified that he reviewed the audiotape made the day after the murder in order to evaluate Petitioner's speech patterns, behavior, and demeanor. *See* Ex. M-11 at 1499-1500. From the audiotape and a videotape made some time later, Dr. Danziger determined that Petitioner's answers to questions were logical, coherent and rational. *Id*. at 1500. Dr. Danziger testified that there did not appear to be anything in the audiotape or videotape consistent with acute intoxication. *Id*. at 1500, 1555. Dr. Danziger admitted that the videotape did not rule out that Petitioner may have used drugs before the crime. *Id*. at 1556. However, Petitioner told Dr. Danziger that he had not used any intoxicating substances on the day of the crime. *Id*. at 1498. Dr. Danziger testified that he did not believe

---

[21]Petitioner states that "Dr. Riebsame explained that this diagnosis is confirmed by third-party sources such as Alonzo Love, Carlton Chance and the confidential informant, all of whom confirmed Mr. Willacy's drug abuse around the time of the homicide." *See* Doc. No. 69 at 47. Dr. Riebsame also indicated that Petitioner's appearance on the videotaped statement to police officers showed markers of cocaine withdrawal. *Id*. at 49. This would have been consistent with cocaine intoxication prior to making the tape.

Petitioner was under extreme mental or emotional disturbance at the time of the crime. *Id.* at 1517-18.

Petitioner cites *Hardwick v. Crosby*, 320 F.3d 1127, 1186 n.209 (11th Cir. 2003) for the proposition that a strategic decision to omit evidence of drug and alcohol addiction is unreasonable because such evidence was valid mitigation. *See* Doc. No. 70 at 33. *Hardwick* is distinguishable from the instant case. Defense counsel in *Hardwick* demonstrated a misunderstanding of mitigation law and presented absolutely no mitigating evidence at the sentencing proceeding. *Hardwick*, 320 F.3d at 1168. At the sentencing phase, Hardwick's counsel failed to present the record evidence of Hardwick's drunk and drugged condition resulting from a well-documented weekend binge of drugs and alcohol. This omission kept from the judge and jury information that, at the time of the murder, Hardwick could have lacked the judgment to conform his conduct to the requirements of law.

In the instant case, Petitioner's counsel presented mitigating evidence that Petitioner's was a "life worth saving." The record reflects that counsel was aware of Petitioner's drug abuse and did not hide Petitioner's drug use from the judge or the sentencing jury. In fact, Petitioner's drug problem was presented as a possible explanation for his out-of-character behavior on the day of the homicide. *See* Ex. G-18 at 2751-2837; Ex. G-20 at 3113-24.[22] Furthermore, the mental health experts disagreed as to whether the

---

[22] Eric Jiles, Petitioner's childhood friend, testified regarding Petitioner's attempt to seek drug rehabilitation treatment and his desire to be free of drug addiction. *See* Ex. G-18 at 2756-58. Andrea Jiles, the father of Eric Jiles, spoke of Petitioner's good character prior to getting involved in drugs and Petitioner's sincere desire to cure his drug problem. He also testified as to changes in Petitioner's physical appearance after he began using drugs.

evidence indicated that Petitioner was intoxicated at the time of the crime.  In addition, unlike the petitioner in *Hardwick*, both mental health experts testified that Petitioner was able to appreciate the criminality of his conduct and his capacity to conform his conduct to the requirements of the law was not substantially impaired.

### d.     Prejudice

In order to show prejudice, Petitioner must "show [ ] that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland,* 466 U.S. at 687.  Prejudice is established when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "When a [petitioner] challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.  In determining whether there is a reasonable probability of a different result, the Court considers "the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweig[h] it against the evidence in aggravation. " *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quotation omitted) (citation omitted).  To evaluate prejudice, this Court must consider the total available mitigation

---

*See* Ex. G-18 at 2764-68.  Audry Willacy, Petitioner's mother, testified that she was aware that Petitioner had drug problems and that Petitioner moved to Florida in part to get away from the crowd he was involved with in New York.  *See* Ex. G-19 at 2829.  Colin Willacy, Petitioner's father, testified that Petitioner had a drug problem.  *See* Ex. G-19 at 2832.

evidence as adduced before the 1995 penalty phase hearings, at the penalty phase, and at the Rule 3.851 evidentiary hearing.  *See Williams v. Taylor*, 529 U.S. 362, 397-98 (2000).

The Supreme Court of Florida determined that Petitioner did not establish prejudice because presenting mental health mitigating evidence would likely have been more harmful than helpful.  *Willacy*, 967 So.2d at 144.  This Court's role is not to determine whether it thinks the state court correctly concluded that Petitioner was not prejudiced; rather, it must only determine whether the state court's conclusion was unreasonable. *See Woodford v. Viscotti*, 537 U.S. 1149 (2002) (reversing the appellate court's rejection of state court's finding that Petitioner was not prejudiced by his counsel's failure to present mitigation evidence at the penalty phase of his trial).  The Supreme Court of Florida's conclusion was reasonable in the light of recent decisions of the Supreme Court of the United States holding that prejudice had not been established when evidence offered in mitigation was not clearly mitigating or would have opened the door to powerful rebuttal evidence, *see Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), as well as other decisions holding that it is reasonable to conclude that a defendant was not prejudiced when his mitigation evidence "was a two-edged sword or would have opened the door to damaging evidence," *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012) (quoting *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1367 (11th Cir. 2009).  After re-weighing the aggravating and mitigating evidence, the Court cannot conclude that the state court unreasonably applied the prejudice prong of *Strickland.*

During the penalty phase, the State presented the following evidence:  the victim

41

startled Petitioner in the midst of a robbery; Petitioner beat the victim in the head with a hammer and squeegee; Petitioner strangled her to the point of fracturing cartilage in her neck; Petitioner left her for several hours to withdraw money from her bank account; Petitioner then returned to the house, dismantled the home's smoke alarms, positioned a fan on the victim, doused her with gasoline, and lit her afire while she was still alive.  The evidence of Petitioner's guilt was overwhelming.  *See* Ex. G-1-Ex. G-20.

The State presented evidence of five aggravating circumstances: that the murder was committed for the purpose of avoiding or preventing a lawful arrest; that the murder was committed for pecuniary gain; that the murder was especially heinous, atrocious and cruel; and the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.  The trial court, in its sentencing order, found the existence of all five aggravating circumstances.

Petitioner asked the court to consider the statutory mitigating factors that he had no significant history of prior criminal activity; that he was an accomplice in a capital felony committed by another and his participation was relatively minor; and that he was only twenty-two years old at the time of the murder.  *See* Ex. L-2.  Petitioner also asked the court to consider thirty-seven non-statutory mitigating factors relating to Petitioner's character and background and Petitioner's allegedly minor role in the murder.  The court rejected all statutory mitigating factors.  The court rejected the non-statutory mitigators of: the defendant's age at the time of the offense (rejected as a statutory mitigator); the defendant's potential for rehabilitation; the murder was not premeditated; the defendant did not

calculate or plan the murder; the defendant's role in the crime is uncertain; and the defendant was an accomplice in the murder which was committed by another person (rejected as a statutory mitigator). *See* Ex. L-2. The remaining non-statutory mitigators were afforded little weight by the court. *Id.* The court determined that the aggravating circumstances in the case outweighed the mitigating circumstances. *Id.*

During Petitioner's 1995 penalty phase, Kontos presented evidence regarding Petitioner's character and background and argued that Petitioner had only a minor role in the murder. Kontos strenuously argued against and attacked the State's evidence regarding aggravating factors. Through witnesses, Kontos informed the jury of Petitioner's kind acts such as bringing a homeless man inside a restaurant because it was "bitterly cold" outside, *see* Ex. G-18 at 2753-54, or talking a high school friend out of killing herself. *See* Ex. G-19 at 2834. He presented testimony from Petitioner's former high school track coach and Petitioner's family members regarding Petitioner's good nature and helpfulness, his honesty, strong work ethic, and his struggle to overcome his drug addiction. *See* Ex. G-18 at 2753-59, 2772-78. In sum, counsel made a case that Petitioner's life was worth saving.

Petitioner contends that counsel should have introduced evidence of his past child abuse, his ADHD, and his chemical dependency on drugs and alcohol to suggest to the jury that Petitioner was under extreme mental or emotional disturbance at the time of the crime. *See* Doc. No. 69 at 41-43; Doc. No. 70 at 33-34. Petitioner also argues that his "antisocial personality disorder is a valid mitigating circumstance for trial courts to consider and weigh." *See* Doc. No. 70 at 37 n.15.

As discussed above, a mental health defense would have opened the door to Petitioner's childhood torture of animals and threatening letters to a teacher and is unlikely to have affected the outcome in favor of Petitioner. *See* Ex. M-11 at 1522-23. This type of evidence would have undermined the evidence of good works that counsel had presented through the testimony of family and friends. Furthermore, any evidence offered as to Petitioner's acute intoxication at the time of the offense would have been countered by the statements of both mental health experts that Petitioner told them that he did not use drugs on the day of the murder and by Dr. Danziger's testimony that tapes of Petitioner made soon after the murder were inconsistent with acute intoxication. *Id*. at 1498. Dr. Danziger's testimony regarding Petitioner's lack of intoxication would have clearly conflicted with Kontos' argument at the penalty phase that Petitioner's actions on the day of the murder were out-of-character and caused by drug usage. Likewise, Petitioner's allegations of childhood abuse would be met with skepticism because Petitioner's family members had consistently testified that his childhood had been a happy one. Finally, the Eleventh Circuit has held that "presenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword': while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence." *Pace v. McNeill*, 556 F.3d 1211, 1224 (11th Cir. 2009).

Further, in prior cases with numerous aggravating factors or a brutal murder, the Eleventh Circuit Court of Appeals has concluded that additional mitigation evidence would not have changed the death sentence. *See Wood v. Allen*, 542 F.3d 1281, 1313 (11th Cir. 2008) (given the brutal, calculated nature of the murder, no reasonable probability that evidence

of low intelligence and special education classes would have swayed the jury); *Callahan v. Campbell*, 427 F.3d 897, 938 (11th Cir. 2005) (the presence of three aggravating factors outweighed evidence of childhood physical abuse in brutal murder); *Daugherty v. Dugger*, 839 F.2d 1426, 1432 (11th Cir. 1988) (given the severity of the aggravating circumstances, failure to present psychiatric testimony was not prejudicial).   While not a rule, this demonstrates the burden a defendant faces when trying to overcome such harsh aggravating factors with mitigating evidence. *See Clisby v. Alabama*, 26 F.3d 1054, 1057 (11th Cir. 1994) ("sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal  murder") (emphasis in original).

Finally, Petitioner argues that the *Porter* decision compels the conclusion that the Supreme Court of Florida unreasonably applied *Strickland*.  As discussed by the Eleventh Circuit Court of Appeals:

> *Porter* provides guidance for situations where counsel, confronted with a fatalistic and uncooperative client, conducts a truncated investigation and presents practically no mitigation evidence at sentencing.  There, counsel became discouraged during the preparation of mitigation evidence because the client was "fatalistic and uncooperative."  *Porter*, 558 U.S. at 40, 130 S. Ct. at 453.  As a result, counsel "had only one short meeting with [the client] regarding the penalty phase . . . [and] did not obtain any of [his] school, medical, or military service records . . . ."  *Id.* at 39, 130 S. Ct. at 453.  Because counsel ignored "pertinent avenues for investigation of which [counsel] should have been aware," the jury in sentencing "heard almost nothing that would humanize [the defendant] or allow them to accurately gauge his moral culpability."  *Id.* at 40–41, 130 S.Ct. at 453–54.

*Anderson*, 752 F.3d at 898.

Here, Petitioners' counsel  conducted an extensive investigation in preparing for the

guilt and penalty phases of the trial.  Counsels' efforts included hiring an experienced psychologist to evaluate Petitioner and interviewing potential mitigation witnesses, including Petitioner, his family members, and friends.  In the penalty phase, his attorneys presented the testimony of several mitigation witnesses, each of whom buttressed the humanization strategy the attorneys had chosen to pursue.  Counsel's performance stands in stark contrast to the performance in *Porter*, where the Supreme Court found counsel deficient for failing "to conduct *some* sort of mitigation investigation."  *See Porter,* 558 U.S. at 40 (emphasis in original).

In sum, this Court cannot conclude that the state court's evaluation of either the performance or prejudice prong of the *Strickland* standard was objectively unreasonable. Accordingly, this claim is denied.

## H.    Claim Eight

Petitioner asserts appellate counsel was ineffective for failing to argue on direct appeal that there was a lack of probable cause to arrest Petitioner and to search his residence.  This claim was raised in Petitioner's initial petition for writ of habeas corpus, and it was denied by the Supreme Court of Florida.  The Supreme Court of Florida found that reasonable grounds existed at the time Petitioner was arrested to believe that he had committed the murder and that the search warrant was supported by probable cause; therefore, since these issues lacked merit, appellate counsel was not ineffective for failing to raise them on direct appeal.

Prior to trial, trial counsel filed a Motion to Suppress Physical Evidence, a Motion to

46

Suppress Identification, and a Motion to Suppress Statements by the Accused.  *See* Ex. A-21

at 3306-09.  The trial court held a length evidentiary hearing on the motions to suppress and

determined as follows: 1) the motion to suppress statements was granted because Petitioner

invoked his right to counsel;  2) the motion to suppress identification was granted because

of an unnecessarily suggestive "show-up"; and 3) the motion to suppress physical evidence

was denied because there was sufficient probable cause to support the search warrant.  *Id*.

at 3338-42.

At the evidentiary hearing, Detective George Santiago testified that he went to the

victim's home to investigate the homicide and noticed a "strong odor of gasoline" in the

house and that there were several items in the patio, such as a television set, a VCR, and a

shotgun.  *See* Ex. A-17 at 2981-83.  Petitioner lived next door to the victim, and Detective

Santiago initially questioned him to determine whether his house had also been burglarized.

*Id*. at 2984-85.  Detective Santiago asked Petitioner for his fingerprints to eliminate him as a

suspect, but Petitioner refused.  However, Petitioner later agreed to go to the police station

at 5:00 p.m..  *Id*. at 2994-96.  Although Petitioner did not appear at the police station,

Detective Santiago interviewed him the next day at Petitioner's house.  *Id*. at 2997.

John Barton reported seeing someone matching Petitioner's description driving the

victim's car around the time of the murder.  *Id*. at 2959-60.  Mrs. Edith Creel, a neighbor, told

Detective Santiago that, on the day of the murder, "she saw a black male come out of the

wooded area" next to the victim's house and "get into a two-tone four-door car."  *Id*. at 2987.

The victim owned a "two-tone LTD" vehicle.  *Id*. at 2951.  Other individuals in the

neighborhood also saw a black male walking the area and driving a two-toned car on the day of the murder.  Mr. Sasscer reported attempting to visit the victim on the day of the murder to discuss purchasing her vehicle, but she did not answer the door.  *Id*. at 3002.

During Petitioner's initial interview, Petitioner stated that he was working on the roof of his house on the day of the murder but that he never saw the victim.  *Id*. at 3000-01.  Later that evening, Detective Santiago received a telephone call from Petitioner's girlfriend, Marisa Walcott,  who told him that she discovered a woman's check ledger in a trash can in Petitioner's house.  *Id*. at 3004.  Detective Santiago returned to Petitioner's house, and Petitioner took him to a trash can, pulled a check ledger out of the trash can, and handed it to Detective Santiago.  *Id*. at 3006.  Detective Santiago recognized the victim's handwriting from his earlier investigation, and, at that point, he arrested Petitioner and secured his house.  *Id*. at 3007-10.

Petitioner provided fingerprints, which were compared to prints found at the murder scene.  *See* Ex. A-18 at 3100.  Petitioner's fingerprints matched those found on a video recorder on the victim's back porch, a gas can in the victim's kitchen, and a fan in the room where the victim was set on fire.  *Id*. at 3100-02.  The fingerprints were compared after Petitioner's arrest but before the search warrant was served.  *Id*. at 3103.

Probable cause for an arrest exists when a law enforcement officer "has reasonable grounds to believe that the suspect has committed a felony.  *Bryant v. State*, 901 So. 2d 810, 826 (Fla. 2005) (quotation omitted) (citation omitted). When dealing with probable cause, it is "viewed from the perspective of a police officer with specialized training and takes into

account the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id*. (quotation omitted) (citation omitted).   In this case, witnesses had identified someone matching Petitioner's description driving the victim's car around the time of the murder, and the victim's checkbook ledger was found in a trash can in his house.   Consequently, the record reveals that the police had the requisite "reasonable grounds to believe that the suspect has committed a felony" when they arrested Petitioner.  Because the claim of lack of probable cause to arrest Petitioner was without merit, appellate counsel was not ineffective for failing to raise it on appeal.

Likewise, appellate counsel was not ineffective for failing to argue on direct appeal that there was a lack of probable cause to search Petitioner's home.[23]  The task of a judicial officer issuing a search warrant is whether, given all the circumstances before him or her, there is a "fair probability that contraband or evidence of a crime [will] be found in a particular place."  *State v. Siegel*, 679 So. 2d 1201, 1203 (Fla. 5th DCA 1996).   In the present case, the search warrant was supported by probable cause.   At the time the search warrant was issued, there was evidence existing that created a fair probability that evidence of the murder would be found at Petitioner's home.   This evidence included, among other matters, the victim's check register being found in Petitioner's home, and Petitioner's fingerprints being found on several items in the victim's house.   Since the claim that there was lack of probable cause to search Petitioner's house was without merit, appellate counsel was not

---

[23]A copy of the search warrant and accompanying affidavit are included in the record.  *See* Ex. A-20 at 3263-69.

ineffective for failing to raise it.

Further, as previously discussed, Petitioner's appellate counsel submitted an initial brief which was comprehensive, thorough, and well-argued.  In fact, one of the claims resulted in the reversal of his sentence.  Certainly, the record clearly evinces the thoroughness and reasonableness of appellate counsel's work.

Petitioner has failed to demonstrate that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Applying the AEDPA's deferential standard, this Court rejects that claim.

## I.      Claim Nine

As claim nine, Petitioner alleges that, after the homicide, a confidential informant, James Brown, told police that an individual named Alonzo Love confessed to taking the victim's cash and credit cards.  *See* Doc. No. 69 at 63.[24]  Specifically, Petitioner alleges:

> The statement was disclosed to the defense during discovery.  However, trial counsel Erlenbach failed to investigate the statement in any manner in his preparation of the case for trial.  Specifically, trial counsel failed to depose or otherwise interview the confidential informant.  At no time did trial counsel attempt to verify the confidential informant's statement or otherwise investigate any potential involvement by Alonso Love in the crimes alleged. The confidential informant's statement implicated a second individual in the victim's murder.  This statement supported Mr. Willacy's statement to police and the participation of a second individual.

*Id*. at 63-64.

---

[24]The record inconsistently refers to Love as Lonzo, Alonzo, Alonso, and Lorenzo. For consistency, this Court will use "Alonzo" as Love's first name.

Petitioner raised the issue of counsel's failure to investigate Brown's statements as part of claim II of his direct appeal of the denial of his motion for postconviction relief.  In claim II, Petitioner asserted that counsel was ineffective for failing to assert an "independent act" defense whereby Petitioner, while involved in the robbery of the victim's home, was not her actual murderer.  *See* Ex. N at 55.  Petitioner alleged in part that a confidential informant implicating Love supported the independent act defense and that counsel failed to investigate the confidential informant.  *See* Ex. N at 56.  The Supreme Court of Florida denied claim II, stating that Love had an alibi, and there was no other evidence linking him to the crime.  *Willacy*, 967 So. 2d at 141.  A careful review of the evidence supports this determination.

Although Petitioner alleges that counsel failed to investigate "in any manner" the informant's statement implicating Love in the crime, *see* Doc. No. 69 at 63, the record does not support the allegation.  At the evidentiary hearing, Erlenbach testified that he had investigated Love.  *See* Ex. M-5 at 638.  Erlenbach also testified that he unsuccessfully attempted to subpoena Brown, but determined that it was more important to take Love's deposition.  *Id*. at 649-50.  Erlenbach chose not to follow up on Brown after deposing Love.  *Id*. at 721-22.  At the deposition, Love told Erlenbach that he was at work at the time of the crime, and Erlenbach confirmed the alibi.  *Id*. at 645.  Furthermore, the reliability of Brown's information was suspect. For example, Brown stated that Love bragged about writing checks on the victim's account, even though none of the victim's checks was missing.  *Id*. at 714-16.  The state trial court determined that "Mr. Erlenbach . . . investigated Lonzo Love based on

51

an indication from Detective Santiago that Love might have been involved. However, Love's employer verified that Love was at work at the time of the crime." *See* Ex. M-19 at 2556-57. The trial court determined that "[counsel's] performance was not deficient, in failing to pursue Love as an alternate or co-suspect where law enforcement had ruled him out as a participant." *Id*. at 2559-60.[25]

Furthermore, counsel's decision to forego pursuit of another participant in the crime was a strategic decision. Strategic decisions made after a thorough investigation are "virtually unassailable" under *Strickland.* 466 U.S. at 690. The question of whether an attorney's actions were the product of a strategic decision is an issue of fact and the state court's decision on that issue is presumptively correct. *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998). Erlenbach followed a strategy of suppressing as much evidence as possible in order to minimize the state's case. *See* M-5 at 651-52. For example, Erlenbach successfully fought to keep Petitioner's statement that he and an accomplice were involved in the murder out of evidence.[26] Erlenbach determined that arguing that Petitioner was involved in the crime, but nevertheless not responsible for the victim's death under felony

---

[25]The state trial court denied Petitioner' claim regarding counsel's failure to depose, or further investigate the confidential informant in a detailed order. *See* Ex. M-19 at 2555-85. The Supreme Court of Florida specifically stated that it did not second-guess the trial court's factual findings. *Willacy*, 967 So. 2d at 142. Furthermore, a federal habeas court will "look through" a later decision to the last reasoned state court opinion as the higher state court's basis for denying the motion. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). To the extent they were not discussed by the Supreme Court of Florida, this Court will defer to the factual findings made in the state trial court order on this issue.

[26]Petitioner initially implicated Carlton Chance in the crime. However, Chance also had an alibi. *See* M-5 at 710-11.

murder was "a harder sell than not." *Id*. at 654, 656. The state trial court noted that counsel's methodical elimination of evidence was sound trial strategy under the circumstances of this case. *See* M-19 at 2555. The Supreme Court of Florida noted that an independent act defense would have been riskier than the evidence-elimination strategy employed by Erlenbach because an admission to law enforcement regarding his involvement in the robbery would be "essentially a confession to felony murder because [Petitioner] admitted his involvement in the murder." *Willacy*, 967 So. 2d at 141-42. Petitioner has presented no "clear and convincing evidence" to rebut the factual finding of the state courts that Erlenbach's decision to not pursue an "independent act" defense was sound trial strategy. 28 U.S.C. § 2254(e)(1).

Finally, even if this Court found Erlenbach's conduct to be sufficiently deficient to establish the first prong of *Strickland*, Petitioner has failed to establish the prejudice prong of the test. Petitioner has not shown what evidence would have been discovered that would have resulted in a different trial outcome if Brown had been deposed or otherwise further investigated. Rather, Petitioner merely speculates that Brown's statement supported the participation of a second individual in the victim's murder. Conclusory claims cannot support a claim of ineffective assistance of counsel. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (a petitioner is not entitled to an evidentiary hearing or federal habeas relief on his ineffective assistance of counsel claims when the claims are conclusory or wholly incredible). In addition, the evidence presented at trial that Petitioner alone committed the murder was overwhelming. *See Strickland*, 466 U.S. at 695 (a reviewing court should consider the "totality of the evidence before the judge or jury" when evaluating whether deficient

performance has prejudiced a defendant).

Petitioner was the victim's next door neighbor, and she knew him; Petitioner's fingerprints were found on the fan motor placed at the victim's feet to fan the flames; Petitioner's fingerprint was on a gas can used to pour gas on the victim before setting her on fire; Petitioner's fingerprint was found on a tape rewinder found on the back porch where stolen items had been left; blood consistent with the victim's was found on a paper towel, tennis shoe, and a pair of shorts taken from Petitioner's home; some of the victim's property was found in Petitioner's home in a gym bag underneath his bed; the victim's check register, jewelry, and coins were found in Petitioner's house;  Petitioner was seen alone driving the victim's car; and Petitioner was seen alone in photographs taken at an ATM when he used the victim's ATM card. *See Willacy*, 967 So. 2d at 142, n.10; Ex. M-19 at 2558-59.

Under *Strickland*, Petitioner has failed to establish incompetent representation or prejudice.  Accordingly, claim nine is denied pursuant to 28 U.S.C. § 2254(d).[27]

## J.     Claim Ten

---

[27]Petitioner also alleges that Erlenbach was deficient for failing to hire an investigator to conduct an independent investigation of the crime scene, potential suspects and witnesses; for failing to employ a fingerprint expert to analyze the prints obtained from the crime scene and to review the analysis conducted by the state; and for failing to hire an independent crime scene investigator to review the evidence. *See* Doc. No. 69 at 64.  These issues were raised as claim X in Petitioner's Rule 3.851 motion for postconviction relief, and the trial court denied relief. *See* Ex. M-16 at 2188; Ex. M-19.  Petitioner did not raise these issues on appeal to the Supreme Court of Florida.  As such, these claims will treated as procedurally defaulted and this court cannot review them. *See Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1351 (11th Cir. 2004) (when unexhausted claims would be procedurally barred in state court, the district court can treat those claims as providing no basis for federal habeas relief).

As claim ten, Petitioner alleges that he was denied effective assistance of counsel because counsel failed to object when the jurors were not sworn for his trial.  *See* Doc. No. 70 at 50.  Specifically, Petitioner states that "the trial counsel's failure to adhere to the statutorily mandated commencement of trial rendered the proceeding a nullity in that the trial court did not have jurisdiction to try, convict and sentence Mr. Willacy."  *Id*. at 52. Petitioner alleges that he was prejudiced because juror Clark "gave little or no regard to the oath administered by the jury clerk and the subsequent questioning  by the jury clerk.  In fact, he testified that this was of little significance to him.  Had a trial court administered the oath, Clark would not have perceived the questioning as a `formality' but would have clearly known the importance of the jury selection process."  *Id*. at 51.

This issue was raised as claim fifteen in Petitioner's Rule 3.851 motion for postconviction relief, and the trial court denied the claim noting that the venire was properly sworn by the jury clerk pursuant to Florida Rule of Criminal Procedure 3.300(a).  Petitioner appealed the issue of whether the trial judge erred in denying an evidentiary hearing on claim fifteen. The Supreme Court of Florida held:

> Finally, the trial court denied Willacy an evidentiary hearing on claim 15, in which Willacy argued that trial counsel was ineffective for failing to object to the trial court's failure to swear the jury prior to voir dire.  Florida criminal procedure does not mandate that a judge swear the jury after the venire has already been sworn by the jury clerk.  Therefore, Willacy's ineffective assistance of counsel claim is legally insufficient.  No evidentiary hearing was required.

*Willacy v. State*, 967 So. 2d 131, 140 (Fla. 2007) (internal citations omitted).  A review of the record and pertinent Florida law supports the state court's conclusion that relief is not

warranted.

Florida Rule of Criminal Procedure 3.300(a) requires that members of the venire, the group of jurors from which a jury will be selected, each swear that they will truthfully answer all questions during jury selection.[28]  In many Florida courts, the preliminary oath is administered to the venire in a jury assembly room, before the jurors are questioned about their legal qualifications and before they are divided into smaller groups for questioning in individual cases. *See Lott v. State*, 826 So. 2d 457, 458-59 (Fla. 1st DCA 2002); *Pena v. State*, 829 So.2d 289, 293-94 (Fla. 2nd DCA 2002).  Rule 3.300(a) does not require that the preliminary oath be given at a particular time or that it be given more than once.  Therefore, if the jurors have taken the oath in the jury assembly room, they need not take it again in the courtroom. *Lott*, 826 So. 2d at 458-59.  Florida case law further permits a trial judge to delegate to a deputy clerk the process of swearing potential jurors. *See Johnson v. State*, 660 So. 2d 648, 660 (Fla.1995).  It can be determined from the record, and Petitioner does not deny, that the jury pool was sworn by the jury clerk before the voir dire proceedings.  *See* Ex. A-1 at 57.[29]

---

[28]Rule 3.300(a) states as follows:

**(a) Oath**. The prospective jurors shall be sworn collectively or individually, as the court may decide. The form of oath shall be as follows:

"Do your solemnly swear (or affirm) that you will answer truthfully all questions asked of you as prospective jurors, so help you God?"

If any prospective juror affirms, the clause "so help you God" shall be omitted.

[29] The clerk informed the trial judge that "the jurors have been qualified by our jury clerk."  *See* Ex. A-1 at 57.

Furthermore, Petitioner has made no showing that he is likely to have prevailed at trial with a different jury.  In order to satisfy *Strickland's* prejudice prong, it is not enough "to show that [counsel's] errors had some conceivable effect on the outcome of the proceeding" because "[v]irtually every act or omission of counsel would meet that test." *Strickland,* 466 U.S. at 693. " The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  Petitioner's claim that, if the trial court had administered the oath, juror Clark would have "clearly known the importance of the jury selection process" is merely speculative and does not amount to a showing of prejudice. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (a petitioner is not entitled to an evidentiary hearing or federal habeas relief on his ineffective assistance of counsel claims when the claims are conclusory or wholly incredible).

Since the underlying claim is meritless, Petitioner cannot establish cause or prejudice to satisfy the *Strickland* standard.[30]  Accordingly, the trial court's determination that Petitioner's ineffective assistance of counsel claim is legally insufficient is not in conflict with

---

[30] Florida courts have reached the same conclusion on the identical issue. *See Hayes v. State*, 855 So.2d 144 (Fla. 4th DCA 2003)(holding that petitioner's ineffective assistance of counsel claim based upon counsel's failure to object when the trial court judge failed to place prospective jurors under oath prior to voir dire was legally insufficient to warrant further postconviction proceedings, where petitioner failed to preclude possibility that venire was placed under oath in jury assembly room, and petitioner failed to show that results of proceeding would have been different or that an unsworn juror lied during voir dire, affecting jury composition).

clearly established federal law or based on an unreasonable determination of the facts, and its result should not be disturbed.

## K.    Claim Eleven

Petitioner contends that the state trial court violated his constitutional rights by excusing for cause a juror opposed to capital punishment without allowing defense counsel an opportunity to rehabilitate the juror. Petitioner raised this claim on direct appeal and the Supreme Court of Florida upheld his conviction, but reversed for a new penalty phase. *Willacy v. State*, 640 So. 2d 1079 (Fla. 1994).  The Supreme Court of Florida noted that the trial judge properly sustained the State's challenge for cause but, pursuant to Rule 3.300(b),[31] the trial court should have allowed defense counsel an opportunity to rehabilitate the juror.  *Id.* at 1082.  The Supreme Court of Florida  determined that the death sentence, but not the conviction, was affected by the Rule 3.300(b) violation.  *Id.*  The sentence of death was vacated, and the case was remanded for a new sentencing proceeding. *Id.* According to Petitioner, the state courts's failure to reverse his conviction and to grant him a new trial was objectively unreasonable, and the exclusion of potential jurors opposed to capital punishment substantially increased the risk of conviction.  *See* Doc. No. 70 at 55.  Upon a

---

[31] Florida Rule of Criminal Procedure 3.300(b) states:

> The court may then examine each prospective juror individually or may examine the prospective jurors collectively.  Counsel for both the state and defendant shall have the right to examine jurors orally on their voir dire.  The order in which the parties may examine each juror shall be determined by the court.  The right of the parties to conduct an examination of each juror orally shall be preserved.

review of the record, this Court finds that the state court's adjudication of this issue was not objectively unreasonable.

Petitioner's claim is premised on relevant portions of the voir dire examination of excluded juror Maria Cruz:

> MR. WHITE [state attorney]: Is there anything that you know of that would make it impossible or difficult to serve on this jury?
>
> MS. CRUZ: The same as the first gentleman. If it ever came to the penalty part, I will not be able to give a death penalty sentence.
>
> MR. WHITE: You realize from all the questions that the law is, if you are to serve here, you should consider the death penalty under the applicable rules and law that the Court gives you. Are you saying you cannot abide by that law?
>
> MS. CRUZ: Right.
>
> . . . .
>
> MR. WHITE: Well, your Honor, with regard to Miss Cruz, it's the State's position that she's announced that under her beliefs, religious or conscientious or whatever, she could not abide by the law with regard to the penalty in this case, and for that reason we would ask the Court to excuse her for cause.
>
> THE COURT: Very well. Miss Cruz, you may step on down and return to the jury pool area.
> . . . .
>
> MR. ERLENBACH [defense counsel]: Your Honor, we would like a brief opportunity to try to rehabilitate.
>
> THE COURT: The Court has ruled, Mr. Erlenbach.

*See* Ex. A-3 at 489-91.

Petitioner's argument that Cruz's exclusion from the jury warranted reversal of his

conviction is without merit.  The Supreme Court of Florida applied both clearly established

Federal law and  Florida law in its determination that the trial court erred when it refused

to allow Cruz to be rehabilitated.  *Willacy I*, 640 So. 2d at 1082 ("The trial judge properly

sustained the State's challenge for cause, but committed error in not affording defense

counsel an opportunity to rehabilitate the juror pursuant to rule 3.300(b)").  Furthermore, the

Supreme Court of Florida compared two Florida cases in making its determination that only

Petitioner's death sentence and not his conviction was tainted by the trial court's error.  *Id.*

(comparing *O'Connell v. State*, 480 So.2d 1284 (Fla. 1985) with *Hernandez v. State*, 621 So. 2d

1353 (Fla. 1993)).  It is not the province of a federal habeas court to re-examine state-court

determinations on state-law questions.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  A federal

habeas court is limited to deciding whether a conviction violated the Constitution, laws, or

treaties of the United States. *Id.*  Therefore, to the extent that claim eleven is based on the

state court's erroneous application of Florida law, the claim must be denied.  Federal habeas

relief is not meant to correct errors of state law.  *Id.* at 67-68.

Petitioner's argument that the Supreme Court of Florida violated the rule in

*Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968) by reversing only the penalty portion of

Petitioner's trial is equally unavailing.  In *Witherspoon*, the Supreme Court of the United

States held that "a sentence of death cannot be carried out if the jury that imposed or

recommended it was chosen by excluding venire men for cause simply because they voiced

general objections to the death penalty or expressed conscientious or religious scruples

against its infliction."  *Id.* at 522.  The Supreme Court subsequently attempted to refine the

standard and alleviate confusion in the lower courts in *Wainwright v. Witt*, 469 U.S. 412 (1985). In revisiting the issue of the degree of deference a federal court in a habeas corpus proceeding should pay a state court's excusal of prospective jurors for their views opposing capital punishment, the *Witt* Court held that the standard is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The Court added that this standard does not require that the "juror's bias be proved with 'unmistakable clarity.'" *Id.* Noting that assessments of demeanor and credibility are "peculiarly within a trial judge's province," the Court also decided that the trial court's determination on this issue is a factual finding deserving deference on habeas review. *Id.* at 428-29. The Supreme Court of Florida adopted the *Wainwright* reasoning in *Foster v. State*, 614 So.2d 455 (Fla. 1992).

Notably, although the Supreme Court has determined that a death sentence cannot be carried out if a juror was improperly excluded, it has expressly refused to require that such improper exclusion requires a new guilt phase. In *Witherspoon*, the Supreme Court stated:

> We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

391 U.S. at 517-18.

Petitioner has not explained how the state court's decision to grant only a new penalty phase of his trial was contrary to, or involved on unreasonable application of federal law or how the state court's determination was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner also argues that habeas relief in the form of a new trial is warranted because the exclusion of potential jurors opposed to capital punishment substantially increased the risk of conviction. *See* Doc. No. 70 at 56. Constitutional challenges to the use of a death-qualified jury in the guilt-innocence portion of a trial were rejected by the United States Supreme Court in *Lockhart v. McCree*, 476 U.S. 162, 177-78 (1986) (holding that the use of a death qualified jury during the guilt or innocence stage neither deprives a defendant of his Sixth Amendment right to a jury drawn from a representative cross section of the community nor his right to an impartial jury and rejecting the claim that excluding jurors from the guilt-innocence phase who could not be impartial during the punishment phase resulted in a jury slanted in favor of conviction). Petitioner offers no clearly established federal law in support of his position that the exclusion of Cruz substantially increased the risk of conviction. Accordingly, the Court finds that Petitioner has failed to establish that the state court's determination was either contrary to or an unreasonable application of federal law, and this claim is denied.

## L.    Claim Twelve

Petitioner alleges that he was denied effective representation by appellate counsel because appellate counsel failed to argue that his resentencing jury was not fully instructed

as to the cold, calculated and premeditated aggravating circumstance.  *See* Doc. No. 69 at 56.

Petitioner notes that the jurors were instructed that "[p]remeditation means that the defendant

exhibits a higher degree of premeditation than that which is normally required in a

premeditated murder."  *Id.*  According to Petitioner, this instruction "left the jurors in a

vacuum as to what is 'normally required'" to establish premeditated murder."  *Id.*

Petitioner raised this issue in his state petition for a writ of habeas corpus which was

denied.  *See* Ex. Q.  The Supreme Court of Florida determined that appellate counsel was not

ineffective for failing to raise the issue because trial counsel had not preserved the issue for

appeal:

> Finally, Willacy claims that appellate counsel was ineffective for failing to argue
> that the jury was improperly instructed as to the aggravating circumstance of
> cold, calculated and premeditated (CCP).  Because the record does not indicate
> that counsel specifically requested a jury instruction distinguishing between
> "ordinary premeditation" and the premeditation required for the CCP
> aggravator "cold, calculated and premeditated," the issue was not preserved for
> appeal.

*Willacy v. State*, 967 So. 2d 131, 148 (Fla. 2007).

This Court must defer to the Supreme Court of Florida's factual conclusion that, as a

matter of state appellate procedure, this claim was not preserved for appeal unless Petitioner

was able to rebut the state court's presumption of correctness by clear and convincing

evidence.  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court

shall be presumed to be correct.   [Petitioner] shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence.").

Petitioner argues that the issue was properly preserved at the trial court level because

63

defense counsel requested that the court instruct the jury as to the elements of "ordinary" premeditated murder and the trial court denied the request. *See* Doc. No. 69 at 69.  In support of this allegation, Petitioner points to portions of the record in which counsel requested that the trial court instruct the jury as to the differences between premeditated murder and felony murder. *Id.*  Notwithstanding Petitioner's assertion, a review of the record and Florida law regarding preservation of objections to jury instructions supports the state court's determination that the issue was not properly preserved.

Under the Florida Rules of Criminal Procedure, in order to preserve an objection to a jury instruction, a party must specifically and distinctly object after the trial judge has instructed the jury.  Fla. R. Crim. P.  3.390(d) ("[N]o party may raise on appeal the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.").  There is a limited exception to Rule 3.390(d) when a defendant has already objected to a jury instruction, and it is clear that the court understood the objection and denied it.  In such a case, counsel is not required to specifically re-raise the objection after the instructions because such a requirement would be fruitless. *Marquard v. State*, 850 So. 2d 417, 433 (Fla. 2002) (citing *State v. Heathcoat*, 422 So. 2d 955, 955-56 (Fla. 1982)).  However, for this exception to apply, the trial court must fully understand the reasons for and the nature of the requested instruction and the request must be denied with full understanding of those reasons. *Heathcoat*, 442 So.2d at 955-56; *see also Franqui v. State*, 804 So. 2d 1185, 1192 (Fla. 2001) (finding that the purpose of preservation is to "place the trial judge on notice that an

error may have occurred and provide him or her with the opportunity to correct the error at

an early stage of the proceedings.").  In the instant case, at the end of the jury charges, defense

counsel did not make any specific objections, but he did state  that he had no other objections

other than those already ruled on.  *See* Ex. G-20 at 3144.  Therefore, because appellate counsel

had no obligation to raise an unreserved issue, appellate counsel cannot be deemed ineffective

for failing to do so. *See Card v. Dugger*, 911 F.2d 1494, 1520 (11th Cir. 1990) (appellate counsel

not ineffective where the issue was not properly preserved).

Moreover, even if counsel made a proper objection to this portion of the jury

instructions, it is not clear from the record that Petitioner requested that the jury be informed

of the elements of "ordinary" premeditation for the purpose of distinguishing it from the

degree of premeditation necessary to prove the aggravating circumstance of cold, calculated

and premeditated.  In a lengthy discussion with the trial court, defense counsel  Kontos and

Thompson[32] asked the court "to define premeditated murder and felony murder so [the jury]

know[s] the difference"noting that:

> MR. THOMPSON:  [A] lot of [jurors] just assumed first-degree murder is
> premeditated murder, and that's the confusion I want  to
> avoid because it gives them a leg up in proving -- it may
> give them a leg up in proving cold, calculated and
> premeditated and I don't want them to assume that,
> because he's convicted of first-degree murder, that cold,
> calculated and premeditated is that much closer to being
> proven or already proven and established and --
>
> MR. KONTOS:  The  proof  of  the  other  aggravator,  too.    If  they're

---

[32]Jeffrey Thompson was defense co-counsel during Petitioner's second penalty
phase.

convinced this was a felony murder or convinced that another person committed the murder, then they may not find that the aggravator – any of the aggravators occurred or that the statutory mitigators requested occurred.  I would request they be instructed as to the theories that the original jury was told they could find the defendant guilty of.

*See* Ex. G-19 at 2984-85.  After discussion on the issue, defense counsel requested the following specific jury instruction:

MR. KONTOS:    What I think would be an appropriate instruction would be – the first portion of this is fine.  The previous jury returned a verdict of first-degree murder, but the verdict form did not specify whether he was guilty of premeditated murder, felony murder or both and then define killing with premeditation is killing after consciously deciding to do so.  The decision must be present in the mind at the time of the killing. The law does not fix the exact period of time that must pass between the formation of a premeditated intent to kill and the killing. The period of time must be long enough to allow reflection by the defendant.  Premeditated intent to kill must be formed before the killing.

And then go into the second way a person may be convicted of first-degree murder is known as felony murder.

MR. THOMPSON:    That's sort of a limited definition.

MR. KONTOS:    Either the defendant was the person who actually killed the victim or the victim was killed by a person other than the defendant who was involved in the commission, or in the attempt to commit, one of the above-listed offenses, but the defendant was present and did knowingly aid, abet, counsel, hire or otherwise procure the commission of one of the above-listed offenses.

[THE STATE]:    It just doesn't make any sense to me to tell them we don't

66

know which way this jury found him guilty and then define the two ways that we don't know which way the found him guilty. I think it's unnecessarily confusing and does invite them to possibly reconsider the issue of guilt themselves.

THE COURT:     Is that the basis for your arguing about the third party, Mr. Kontos?

THE KONTOS:    I don't understand what you're saying sir.

THE COURT:     The other party that may have committed the murder, is that the basis for your –

MR. KONTOS:    That's part of the basis. Yes, sir.

THE COURT:     I'll deny your request to give the instruction. You can stand there and argue about it until your heart is content for all I care. Do you see what I mean? I don't think we need to go back behind that jury's verdict, but if you want to tell them we don't know what that jury found him guilty of, but this is the reason why you should consider so and so and so and so, I think – I don't see where an instruction will help you or hinder you. It might hinder you more than it will help you. It will certainly create confusion in the minds of that jury and it wouldn't invite them to reexamine the issues of guilt.

Do you have a problem with that?

MR. KONTOS:    Yes, sir. I have to object to not giving them an instruction we requested. I requested the instruction, and obviously I think it's appropriate to give it and if it's not going to be given, I need to object to it not being given. I understand the court's ruling but I ask that it be given.

*See* Ex. G-19 at  2991-93.

Notably, in this requested instruction, defense counsel did not mention the higher

standard of premeditation required to prove the aggravating circumstance of cold, calculated

and premeditated and did not explain to the trial court the need to differentiate between the standards of premeditation, despite being specifically asked by the court for the basis of the proposed instruction. As such, it is not clear that the trial court "clearly understood the request and just as clearly denied the request," and the limited exception to Rule 3.990(c) does not apply. *Heathcoat*, 442 So. 2d at 955-56.

Petitioner has failed to overcome the Supreme Court of Florida's conclusion that this claim was not preserved for appeal. Appellate counsel has no obligation to raise an issue that was not preserved for review and is not ineffective for failing to raise an unpreserved issue on appeal. *See Randolph v. State*, 853 So. 2d 1051, 1068 (Fla. 2003); *see also Diaz v. Sec'y, Dep't of Corr.*, 402 F.3d 1136 (11th Cir.2005) (non-meritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel). Petitioner cannot show that appellate counsel acted unreasonably or that he was prejudiced by appellate counsel's failure to raise this issue on appeal. As such the state court's decision was not contrary to, nor an unreasonable application of, clearly established federal law and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, claim twelve is denied.

## M.    Claim Thirteen

Petitioner argues in claim thirteen that his death sentence violates his constitutional rights under *Strickland* for the reasons set forth in *Porter*. This claim was raised in Petitioner's motion for postconviction relief filed with the state trial court in 2010. The trial court found that the motion was "untimely, successive, procedurally barred, facially insufficient, and

unauthorized under" Florida Rule of Criminal Procedure 3.851.  *See* Ex. AA-5 at 3.  The trial

court also found that *Porter* did not apply retroactively and that, in any event, *Porter* was

distinguishable because the trial court and the Supreme Court of Florida "specifically

addressed that trial defense counsel's performance was not deficient, and also conducted a

full analysis of the prejudice prong under *Strickland* . . . ."  *Id.* at 4.  The Supreme Court of

Florida affirmed *per curiam*, citing to *Walton v. State*, 77 So. 3d 639 (Fla. 2011).[33]

This claim is without merit.  First, the claim is procedurally barred because the trial

court so determined in its order denying Petitioner's motion for postconviction relief, and the

Supreme Court of Florida affirmed *per curiam*.  The denial on procedural bar grounds was a

correct application of Florida law.  Petitioner has neither alleged nor shown either cause or

prejudice that would excuse the default.  Likewise, Petitioner has neither alleged nor shown

the applicability of the actual innocence exception.  A review of the record reveals that the

Petitioner is unable to satisfy either of the exceptions to the procedural default bar.  Therefore,

this claim is procedurally barred.

Next, the Court discussed and distinguished *Porter* under claim seven and specifically

found that the facts in *Porter* were significantly different from the facts in this case and that,,

consequently, *Porter* provided no basis for federal habeas relief.  As discussed above, counsel

conducted a mitigation investigation, and counsel's decision not to seek more mitigating

evidence from Petitioner's background than was already in hand fell within the range of

---

[33]In *Walton*, the Supreme Court of Florida found that the *Porter* decision did not
constitute fundamental change in constitutional law mandating retroactive application in
postconviction proceedings

professionally reasonable judgments.  The state court's rejection of this claim was neither an unreasonable application of nor contrary to clearly established federal law as determined by the Supreme Court of the United States.  As a result, this claim is denied.

## V.    CONCLUSION

The Court finds that the claims raised in the instant petition are without merit and must be denied with prejudice.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.    The Amended Petition for Habeas Relief (Doc. No. 69) filed by Chadwick Willacy is **DENIED**.

2.    The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

3.    This Court should grant an application for certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Accordingly, a Certificate of Appealability is **DENIED** in this case.

**DONE AND ORDERED** in Orlando, Florida, this 18th day of July, 2014.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies to:
OrlP-2 7/18
Counsel of Record

70